## In re WOLF CO.

### (District Court, M. D. Pennsylvania. September 29, 1908.)

### No. 976, in Bankruptcy.

1. BANKRUPTCY (§ 58*)—VOIDABLE PREFERENCE—KNOWLEDGE OF CREDITOR.

   A creditor of a bankrupt, who at the time of receiving a preference was put on inquiry as to the solvency of the debtor, was not for that reason charged with notice of facts which could only be learned from intimate and inaccessible sources of information, such as the books of the bankrupt, but was bound only by such information as could be obtained by open observation and reasonable inquiry.

   [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 58.*]

2. BANKRUPTCY (§ 58*).

   A creditor of a bankrupt corporation, who at the time he received a preferential transfer of property as security knew that the corporation was financially embarrassed and was pressing for payment, *held* not to have had reasonable cause to believe it insolvent, so as to render the preference voidable, although such was the fact where he made inquiry as to its condition from its officers and others who were in the best position to know, and was assured that the value of its property exceeded its debts and that its embarrassment was only temporary.

   [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 58.*]

In Bankruptcy. Sur exceptions to report of Samuel F. Huber, special master, dismissing petition of J. B. Allender for rule on receiver to withdraw notice of claim.

The following is the report of the master:

#### Findings of Fact.

First. J. S. Allender, the petitioner, loaned to the Wolf Company $8,000 on a promissory note, and on the 12th of January, 1907, obtained an assignment by the Wolf Company to him as collateral of a claim of $14,596.33 which the Wolf Company had against the Pacific Export Lumber Company, of Portland, Or. On the 8th of April, 1907, the Wolf Company was adjudicated an involuntary bankrupt, and the same day your honorable court appointed Walter K. Sharpe, Esq., receiver, who as receiver notified the Pacific Export Lumber Company not to pay the money due on the claim to J. S. Allender, the petitioner, but to pay the same to him as receiver. The Pacific Export Lumber Company then refused to pay the same to J. S. Allender, and J. S. Allender petitioned your honorable court to decree that Walter K. Sharpe, receiver, withdraw his claim to the fund, and that the same be paid to J. S. Allender, the petitioner, and on account of which petition the matter was referred to Samuel F. Huber, as special master, and to which petition the receiver filed his answer denying the petitioner's right to said fund, and a supplementary answer, praying the court to adjudge and decree the said assignment null and void, and that the same be set aside, and the receiver of the Wolf Company, or any trustee of said company, be directed to collect the said claim from the Pacific Export Lumber Company. The master sat six days, and took the testimony, and makes report thereon.

Second. The Wolf Company, a manufacturer of flour mill machinery, is a Pennsylvania corporation chartered in 1902, and has its principal place of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

business in Chambersburg, Pa. On the 8th of April, 1907, upon a petition filed by certain creditors, the Wolf Company, admitting the facts in the petition, was adjudicated an involuntary bankrupt, and the same day Walter K. Sharpe, Esq., of Chambersburg, Pa., was appointed receiver, who as receiver continued to operate the business of the company. On the 12th day of January, 1907, there was assigned to J. S. Allender. an unsecured creditor of the company, a certain account which the Wolf Company held against the Pacific Export Lumber Company, of Portland, Or., which then amounted to $14,596.33, but which was reduced by penalties at various times since that, and is now admitted to be about $7,500, a copy of which assignment is as follows:

### Exhibit D—Transfer Wolf Co. to J. S. Allender.

"Whereas, a certain contract was entered into June 26, 1905, by and between the Wolf Company, of Chambersburg, Pa., of the one part, and the Pacific Export Lumber Company, of Portland, Or., of the second part, wherein party of the first part agreed to furnish to party of the second part certain machinery to be used by the Hong Kong Milling Company, at Hong Kong, China ;

"And whereas, the Wolf Company claims there is a balance yet due on this contract, including extras, to the amount of fourteen thousand five hundred and ninety-six and $33/100$ dollars ($14,596.33) ;

"And whereas, the Wolf Company is indebted to J. S. Allender on a certain note, a copy of which is as follows:

" 'The Wolf Company Works, Flour Mill Machinery.
" 'No. B345. $8,000.00
" 'Chambersburg, Pa., May 1, 1906.

" 'Six months after date we promise to pay to the order of J. S. Allender, at the office of the Wolf Company, Chambersburg, Pa., eight thousand and no/$100$ dollars, without defalcation, for value received, with interest at 6 per cent. The Wolf Company
" 'Due Nov. 1, 1906. By H. G. Wolf, President.'

"Now, know all men by these presents, that we, for value received, hereby assign, transfer, and set over to J. S. Allender, as collateral, to be recovered by him to his use, to secure the above-described note, all sum or sums of money now due or to become due to us from the Pacific Export Lumber Company on the contract above referred to, with full authority to sue, recover, collect, and receive the same from the said Pacific Export Lumber Company, as fully as we could do ourselves, and out of the first money collected pay the above-described note and interest in full, together with the costs and expenses of recovering the same, if any, and the balance of the proceeds to be returned to the Wolf Company.

"In witness whereof, the Wolf Company has hereto attached its signature by its president and affixed its corporate seal, duly attested by its treasurer.
"The Wolf Company,
"Attest: I. C. Walk, Treasurer. By H. G. Wolf, President."

If the plant, assets, and business of the Wolf Company were sold, unsecured creditors would receive from 15 to 20 per cent. on their claims. If J. S. Allender receives the money on the account assigned, he will thus obtain a greater percentage of his debt than any other of the creditors of the Wolf Company of the same class. It does not appear that the assignment was recorded, nor does it appear that recording is required. It was admitted by the petitioner that the Wolf Company was insolvent on the 12th of January, 1907. The same condition continued without any material change to the 8th of April, 1907, the day of the adjudication.

Third. J. S. Allender, the petitioner, a man 55 years of age, has been a resident of the city of Baltimore, Md., for the past 13 years, and has been selling flour mill machinery for 25 years, and has since 1902 been on the road traveling in different parts of the United States selling flour mill machinery for the Wolf Company, with the exception of about a month in each year, and during that period at different times visited at the offices of the

164 F.—29

company. His last term of employment was for one year, which contract terminated 1st of January, 1907, but his employment by the Wolf Company for the last two months is disputed. The last year of his employment was spent largely in the Pacific Coast states for the company, during which time he came East to its offices, spending a short time there in February and July. J. S. Allender has been a money lender for the last 15 years, and in 1900 loaned $1,200 to the Wolf Company, which loan was renewed and amount increased from time to time until it reached the sum of $8,000, for which he held a note, which note was renewed from time to time for about three years. The last renewal was the 1st of May, 1906, at which time the company gave its note for $8,000 for six months at 6 per cent.

Fourth. Prior to the last renewal there was some correspondence between H. G. Wolf, president of the Wolf Company, and Mr. Allender, in reference to it. Mr. Allender, the petitioner, desired a 30-day renewal, and Mr. Wolf suggested that, if Mr. Allender desired the note paid, the company would prefer to make four notes of it, payable in 30, 60, and 90 days, and 4 months, as this arrangement was preferred by the company. On the 10th of April, 1906, the said president forwarded to the petitioner a letter in which he inclosed a statement purporting to show the financial condition of the company, which showed that after paying the debts, including the capital stock, the company had a surplus of $70,434.90. The petitioner agreed by a telegram to renew the note for six months, to which the president of the company wrote as follows: "The writer wants to personally assure you that you need not have any alarm as to the financial standing of the Wolf Company, and if you get any report to the contrary, and will advise us, we shall be only too glad to inform you as to the true facts." In this letter he inclosed a financial statement, showing an increased surplus on April 25, 1906. The petitioner wrote to the president of the company as follows: "Harry, if you and Mr. Walk have a certain knowledge that this is gilt-edge paper, you can renew for six months as before. I note statement inclosed. It has but little effect on me. I rely on yours and Mr. Walk's honor. I borrowed money myself lately to make ends meet, but I am satisfied that a note of $7,700 will be paid in bank on the same day yours is due. That will help me out. I am getting 7 to 8 per cent. on gilt edge now in some places where money is worth more than it is East. I am going to wire you, as I do not believe this will reach you in time." The petitioner visited the offices of the Wolf Company in July, 1906, at which time he had a conference with Mr. Walk, the treasurer of the company, and among other things Mr. Allender was informed that the company was involved in two lumber propositions, one in Lumber City, Ga., to the extent of $60,000, and the other in Pikeville, Tenn., to the extent of $125,-000, and that, owing to the large amount of money required to carry the propositions along, the treasurer felt that if they continued to drain the Wolf Company it would make their position before very long very hazardous.

Fifth. The petitioner had left the $8,000 note with the Grafton Bank & Trust Company, of Grafton, W. Va., and he himself at the time of the maturity of the note was in the state of Oregon. Before its maturity he had written to the company asking for a financial statement, and received no reply, and later notified the company that he would require the payment of the note at maturity, and in a conversation with H. W. Gladhill, another traveling salesman of the company, stated that the company had failed to forward him a requested financial statement, and that he was apprehensive of the status of affairs, and had concluded to collect the note. About the latter part of October the petitioner had a conversation with said H. W. Gladhill, in Portland, Or., who was a salesman and expert miller of the company, being sent there by the company to assist the petitioner in closing a contract, at which time they talked about the petitioner's claim against the company, and the petitioner informed Gladhill that he had advised his banker to collect the note when due, and asked Gladhill's opinion of the company's financial condition. He informed the petitioner that he believed the company had an equity in the business, and that he believed the loan was a safe one. The petitioner for some reason telegraphed his banker not to take any action on the note until he went to Chambersburg, Pa., to investigate. Mr. Gladhill further told him that he believed Mr. Walk had not answered the letter because he was not

in position to give him a favorable answer, and that he probably preferred not to say anything about it. In answer the petitioner stated he would investigate when he came in. The petitioner learned that his note was not paid at maturity, and visited the company's offices, about November 8 or 9, 1906, with reference to the note and an additional loan, if proper security could be obtained. The petitioner had determined, although he had not expressed it to the company, to quit their employment at the expiration of his term, unless arrangements were made to send him to China or to Japan. In his visit he conferred with H. G. Wolf, the president, and I. C. Walk, the treasurer, of the company, and was by them informed that they could not then pay the note, and that if he compelled payment by suit a crash would be precipitated, and he, with other creditors, would lose. He had about this time several conferences with them, and made several trips from Baltimore to Chambersburg, and as the company postponed payment from time to time he placed the collection of his note in the hands of local attorneys, namely, Ruthrauff & Nicklas. The claim was more especially under the care of J. R. Ruthrauff, Esq. On the 16th of November, 1906, the petitioner and the Wolf Company entered into an agreement as follows:

### Exhibit A.

"Whereas, the Wolf Company is indebted to J. S. Allender in the sum of eight thousand dollars ($8,000), represented by a note, a copy of which is as follows:

" 'The Wolf Company's Works, Flour Mill Machinery,
" 'No. B345.                                                    $8,000.00.
" 'Chambersburg, Pa., May 1, 1906.

" 'Six months after date we promise to pay to the order of J. S. Allender, at the office of the Wolf Company, Chambersburg, Pa., eight thousand and no/100 dollars, without defalcation, for value received, with interest at 6 per cent.                                    The Wolf Company,
" 'Due Nov. 1, 1906.                        By H. G. Wolf, President.'

"And whereas, the Wolf Company is trying to effect a reorganization, and has requested the said J. S. Allender to accept a note of Aug. Wolf & Co., for eight thousand dollars ($8,000) in lieu of the note above described:

"Now, it is agreed, this 16th day of November, A. D. 1906, by and between J. S. Allender, of No. 1817 Walbrook Ave., Baltimore, Md., of the first part and the Wolf Company, of Chambersburg, Pa., of the second part, as follows: Said J. S. Allender, in case said reorganization is effected on or before December 1, 1906, agrees to accept the note of Aug. Wolf & Co. for eight thousand dollars ($8,000), payable twelve months after date, with interest at six per cent. (6%), provided all accrued interest now due is paid on the present note, and eighty (80) shares of the preferred capital stock of the reorganized Wolf Company, representing eight thousand dollars ($8,000) of the par value thereof, is placed with him as collateral to secure the payment of the note of Aug. Wolf & Co., above mentioned. The present note to be surrendered and new note accepted simultaneously with the delivery of the stock above referred to.

"The Wolf Company, in consideration of the surrender of its note, in case reorganization is effected within the time mentioned, agrees to give to the said J. S. Allender the note of Aug. Wolf & Co., for eight thousand dollars ($8,000), payable twelve months after date, with interest at six per cent. (6%), secured by eighty (80) shares of the preferred capital stock of the reorganized Wolf Company, representing eight thousand dollars ($8,000) of the par value thereof; also to pay all accrued interest due on the Wolf Company's note at the time of the exchange of notes is made.

"In witness whereof, the parties have hereunto set their hands and seals.
                                        "J. S. Allender.    [Seal.]
                                        "The Wolf Company,
                                                "By H. G. Wolf, President.

"Sixteenth November, 1906. I hereby assign eighty (80) shares of my portion of the preferred capital stock of the reorganized Wolf Company to J. S. Allender, and hereby authorize the treasurer of said company, in case said reorganization is effected within the time mentioned, to deliver the same to

him upon his acceptance of the note of Aug. Wolf & Co., above referred to, to be held by him as collateral to secure the payment of the note of Aug. Wolf & Co., for eight thousand dollars ($8,000).          H. G. Wolf."

Sixth. At the time of the above-mentioned agreement, and prior thereto, both Mr. Allender and his counsel knew that the Wolf Company required additional capital to operate, in consequence of which arrangements had been made by the company with George H. Stewart et al., known as the "Wolf Company Syndicate," whereby the syndicate agreed to advance $92,000 upon certain conditions, in this way furnishing to them necessary capital. The condition upon which the money was advanced was known by Mr. Allender, and he also knew that expert auditors and accountants were working on the books of the company at the offices in November and December, 1906, to ascertain the company's condition. Mr. Allender made frequent visits to Chambersburg about every two weeks, at which time he called at the offices of the company and saw the experts at work on the company's books. It does not appear that he inspected the books of the company while at the offices, or that he requested that privilege or was denied it. He conferred on a number of his visits with his counsel, and discussed the situation with the president and treasurer of his agreement, and threatened suit if the company failed to pay it. On the 1st day of December, 1906, the reorganization scheme mentioned in the above agreement having failed to go through, the agreement, after considerable negotiation, was renewed and the time extended for a period of 30 days. About the 10th of November Mr. Allender had discussed with Mr. Wolf, the president of the company, with respect to making an additional loan, increasing it from $8,000 to $20,000, provided proper collateral could be furnished, at which time he was informed that, on account of the agreement with the syndicate, it could not be done, the bonds having been placed as collateral with the syndicate, and that the company was then endeavoring to arrange to have its creditors accept Aug. Wolf & Co.'s notes at two months or more in place of the Wolf Company obligations.

Seventh. In one of his visits, in November or December, 1906, to the offices of the company, he met John T. Pensinger, a director and salesman of the company, and discussed with him the condition of the company. He (Allender) said "that he had heard some very bad reports in regard to the financial condition of the Wolf Company, and if the reports were true the chances were for him to lose a lot of money with them." He also told Mr. Pensinger that he had loaned them $8,000. About the same visit he had a conversation with H. W. Gladhill, a salesman of the company, about his claim against the Wolf Company, and told him he was going to bring suit unless his claim was paid on the 1st of January, and had so instructed his attorney. He spoke further to Gladhill "about the loan, and the manner in which it was made, and the risk that he had taken," and told Gladhill, further, "that he had made the loan largely on his belief that the Wolf Company and Mr. Walk would inform him if there was any danger; that it was a personal matter between them, and it appeared to him that they had in a measure betrayed his trust, and he believed that he would lose his claim." Mr. Gladhill, who had a room in the office of the company, saw Mr. Allender almost every time he visited the offices of the company, and they discussed the matter of the loan and the condition of the company, and the report of the auditors and accountants, which had then become known. The report was intended to be kept a secret, but was generally known by the employés about the offices. Mr. Allender at this time knew of the report of the auditors and of the results of their examinations, and discussed it with Mr. Gladhill, and in discussion tried to solve the reasons for the indebtedness of the company.

Eighth. About the 1st of January, 1907, at the expiration of the extended agreement, Mr. Allender came to the offices of the Wolf Company and in a conference with Mr. Walk, the treasurer, he was informed that the scheme of the syndicate agreement had fallen through, and they discussed the $92,000 obligation of the syndicate, payable $10,000 1st of February, $30,000 1st of March, and the balance of about $50,000 1st of April. Mr. Allender inquired if the company could meet it, and was told by the treasurer that "it largely depended on Mr. Wolf's efforts to obtain money from some other source," and

the treasurer expressed **a** doubt as to their ability to raise the money to meet the payments. He was further at that time informed that the company was involved in lumber propositions; that they had $125,000 in Pikeville, Tenn., and $60,000 in Lumber City, Ga., and he was fearful that these propositions, to which the Wolf Company had advanced money and taken notes, would be unable to meet them at maturity, and, the said notes having been discounted for the Wolf Company, the Wolf Company might be compelled to meet them when due. In his conversation with the president and treasurer of the company he insisted that his note must be paid or proper security given, and that if the company failed to do it he would bring suit against them. He demanded security, and was told that bonds were not in their possession at that time. He consulted with his counsel in his effort to obtain security, and they called the president to his attorney's office and demanded security, and, failing to obtain it, demanded a judgment note, stating it would not be entered until a future time, and the president, Mr. Wolf, refused to execute such a note for them, and asked for a 10-day extension, stating that he felt he could raise the money. The extension was then granted, and the president left and endeavored to raise the money. About the 10th of January, the expiration of the 10-day extension, Mr. Allender appeared at the offices of the company and asked for Mr. H. G. Wolf, the president, and was informed that he had not returned. Mr. Allender then became very angry, and, speaking of Mr. Wolf, said, "The son of a bitch, the God damned son of a bitch, wants to beat me out of my money," but was told that such was not the case and that they expected Mr. Wolf's return in several days. During the wait for Mr. Wolf's return he discussed the financial condition of the company with Mr. Gladhill and Mr. Walk, and insisted on the payment of his note, and said, unless it was fixed up satisfactorily to him, he would sue the company. On the 12th of January he visited the office of Mr. Wolf, who had then returned, and was informed that the company could not meet the note; that Mr. Wolf was unable to raise the money which he was after. Mr. Allender then again consulted his attorney, and afterwards called Mr. Wolf to the office, and Mr. Ruthrauff, Mr. Allender's counsel, suggested that, instead of bringing suit, the company should give Allender a judgment note as collateral security for his note, but this was refused. He stated that the note would not be entered as a lien against the company's property until the time when judgment might be obtained in case a suit was brought and no defense interposed, viz., the Tuesday following the first Monday of February, but was informed by Mr. Wolf that it would be suicide for the company to do anything of that kind. The matter of other security was taken up, which could be furnished by the company. The Pacific Export Lumber Company's claim was then discussed, and it was finally agreed that it should be transferred to Mr. Allender, copy of which transfer is above set forth, being dated the 12th of January, 1907, marked "Exhibit D."

Ninth. Mr. J. R. Ruthrauff, attorney for Allender, knew at the time of the transfer that the Wolf Company had sent out letters to its creditors in which it asked them for an extension of time to meet their notes and to accept Aug. Wolf & Co.'s paper in settlement of the Wolf Company notes, and thought that it would affect the company's credit, by exciting suspicion as to the company's financial standing, and that this action had caused many creditors to place their claims in the hands of attorneys for collection, and that in addition to the Allender claim he had had other claims for collection against the company, and knew that Charles Walter, a member of the Franklin county bar, had a claim of the Farrel Foundry & Machine Company, of Ansonia, Conn., amounting to about $20,000, and was informed by Mr. Walter that suit would be brought by him if Mr. Allender brought suit on his claim. Mr. Allender stated that in conference with Mr. Wolf he was informed that the indebtedness of the Wolf Company had practically been reduced to $30,000, by having creditors accept Aug. Wolf & Co.'s paper; but he received the greater part of his information from the treasurer of the company, who on a number of occasions informed him of its large indebtedness and expressed his doubt as to its ability to meet its obligations when they fell due.

Tenth. The officers of the company suspected the insolvency of the Wolf Company prior to the examination of the expert accountants, who were em-

ployed in November and December to ascertain the company's financial status for the benefit of the proposed Wolf Company Syndicate, but were not positive. The experts' examination revealed to them the company's insolvency; it being the first real knowledge of this on the subject obtained. Mr. Allender, who knew of the examination which was made by the experts, could, so far as the evidence shows, have obtained the result of the examination from the same source from which the officers of the company obtained theirs, had he made proper inquiry.

Eleventh. The transfer executed 12th of January, 1907, marked "Exhibit D," was made by the president and treasurer, without authority of the board of directors of the company. It does not fully appear from the testimony that the act of the president was beyond his authority, but it was testified by the treasurer that when large loans were made they were authorized by the board of directors and stockholders, and from all the testimony submitted the transfer of a book account or claims of the kind assigned to Allender seems to have been without precedent in the history of the company, and there appears to have been no authority of such transfer at any time granted to the president and treasurer.

## Conclusions of Law.

First. The effect of the enforcement of the transfer by the Wolf Company to J. S. Allender of the Pacific Export Lumber Company claim would be to enable J. S. Allender to obtain a greater percentage of his debt than any other of the creditors of the Wolf Company of the same class. Both J. S. Allender and his counsel, acting for him in the matter of the collection of his note against the Wolf Company, had reasonable cause to believe that it was intended by said transfer to give to him (J. S. Allender) a preference. The Wolf Company was insolvent when the transfer to J. S. Allender was given, and its condition remained unchanged up to the time of the adjudication. J. S. Allender made repeated threats, if the note was not paid, to bring suit. He conferred frequently with his attorney. He visited the offices and discussed with different parties his fear of losing his money, and was told by the treasurer that he was afraid that the company might not be able to meet its obligations. His conduct indicated that he was exceedingly anxious about the status of his claim. He saw the expert accountants at work on the books of the company, and discussed the result of their report with Mr. Gladhill, and would have been able to learn that status of the company from the same source the company itself obtained its information, had he made the proper investigation.

Second. "Sec. 60a. A person shall be deemed to have given a preference, if, being insolvent, he has within four months before the petition * * * made a transfer of any of his property in favor of any person, or made a transfer of any of his property, and the effect * * * of the transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class." Section 60b provides that: "If a bankrupt shall have given a preference, and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee." Act July 1, 1898, c. 541, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445). From the evidence the referee finds that J. S. Allender was in possession of such facts as would have put a reasonably prudent man upon inquiry, and, if made, would have shown that the bankrupt was insolvent. "Notice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would disclose." Coder v. McPherson, 18 Am. Bankr. Rep. 523, 152 Fed. 951, 82 C. C. A. 99; Pittsburgh Plate Glass Co. v. Edwards, 17 Am. Bankr. Rep. 447, 148 Fed. 377, 78 C. C. A. 191. J. S. Allender knew that the treasurer of the company had stated to him that he was afraid the company would not be able to meet its obligations when they fell due, and Mr. Allender also knew something of the adverse report of the experts whom he had seen examining the books of the company. These facts would inevitably incite the ordinary creditor to inquire further into the condition of the company before making a loan, and such an inquest would have developed

the facts that some of the flattering statements he heard with reference to the company's solvency were not true. The preference is therefore voidable, and the prayer of the petition of J. S. Allender should therefore be refused. The prayer of the petition of the receiver, who is now the trustee, should be granted.

Third. Not only is the preference obtained by Allender voidable under the bankruptcy act, but the transfer to him of the Pacific Export Lumber Company's claim, having been executed and delivered by the president and treasurer of the company, without being authorized or ratified by the board of directors of the company, is not binding upon the company, and the prayer of the petition of J. S. Allender should therefore be refused, and authority granted for the payment by the Pacific Export Lumber Company of the amount due to the proper representative of the court and creditors in the bankruptcy proceedings.

O. C. Bowers and J. R. Ruthrauff, for exceptions.

J. A. Strite, opposed.

ARCHBALD, District Judge. On January 12, 1907, the Wolf Company, of Chambersburg, Pa., the present bankrupts, assigned to J. S. Allender, a creditor, an account against the Pacific Export Lumber Company amounting on its face to $14,593.33, but on which only $7,500 was really owing, to secure a promissory note of $8,000 for money which Allender had loaned to the Wolf Company, which had been due since November 1, 1906, and on which he was pressing for payment. Within three months afterwards, on April 8, 1907, the Wolf Company were put into bankruptcy in this court, and a receiver appointed, who subsequently gave notice to the lumber company not to pay the account to Allender; the transfer being contested on the ground that it was a preference. Payment having been refused, Allender has petitioned the court to order the receiver to withdraw his notice and permit him to get the money. The master, to whom the case was referred, sustained the contention of the receiver and recommended that the petition be dismissed, and the case now comes up on exceptions to his report.

The assignment was clearly a preference—whether voidable or not is another matter—and the court cannot, therefore, be expected to do anything to help it out, if that is what is wanted. Pollock v. Jones, 10 Am. Bankr. Rep. 616, 622, 124 Fed. 163, 61 C. C. A. 555. But, rightly considered, that is not the case. The assignment was a complete transfer of the account, vesting title in the creditor, and giving him full authority over it, including the right to sue and collect it, if necessary. The transaction being thus an executed one, there is nothing left to do but to give effect to it, unless it is tainted. The notice from the receiver merely tied up the matter; the lumber company, had suit been brought by the present petitioner, being bound to pay it. The rule taken on the receiver to withdraw his claim may serve to facilitate the collection; but, however decided, it confers nothing on the creditor that he did not have already. And the money, by arrangement between the parties, having now been paid over to the receiver upon the understanding that it was to be disposed of according to the views entertained by the court of the transaction, the petitioner is entitled to it, unless the court is convinced that it amounted to a voidable preference.

The question whether the transfer was a voidable one depends on whether Mr. Allender had reasonable cause to believe that a preference was intended; that is to say, that he was getting a prohibited advantage over other creditors similarly situated. He was if the company was insolvent, but not if it was not; and the case turns, therefore, on whether the signs of insolvency were such as to put him on inquiry, affecting him with whatever it would have discovered. It is not easy to decide, much less to point out in advance, what will amount to notice; each case standing pretty much on its own bottom. Mere financial embarrassment is not always enough, although it usually will be. The law differs somewhat in this respect from what it was formerly, owing to the different meaning given to insolvency, which, under Act March 2, 1867, c. 176, 14 Stat. 517, existed if the debtor was not in a condition to pay his debts in the ordinary course of business (Toof v. Martin, 13 Wall. 40, 20 L. Ed. 481), but not now, unless the aggregate of his property is insufficient to meet his obligations.

In the present instance, the Wolf Company was embarrassed, and, as we now know, insolvent; but whether insolvency was so plainly indicated that Mr. Allender could not properly close his eyes to it is a question. There is no doubt that before the last renewal of his note, May 1, 1906, he hesitated about extending it, and when it came due November 1st, he insisted upon payment, although even then he was ready to more than double the loan if it could be properly secured. Meantime, also, in the preceding July, in an interview with Mr. Walk, the treasurer, he was told that the company was indulging in Southern lumber operations the outcome of which was not encouraging, and in October, in a talk with Mr. Gladhill, another salesman, he expressed doubt as to the safety of the loan, stating that he had written to Walk about it, but could get no answer; and on visiting Chambersburg, about November 10th, he was told by Walk that the note had not been paid because the company had no money. But, on the other hand, he was assured by H. G. Wolf, the president, who was supposed to be a personal friend, that his money was safe, and in accordance with a proposed reorganization of the company, which was under consideration by a syndicate who had taken an option on the property, he was offered the obligation of Aug. Wolf & Co., an auxiliary concern, who were to take over the lands of the Wolf Company in different states, as well as certain personal assets, and assume the floating indebtedness. Allender thereupon consulted Mr. Ruthrauff, a prominent attorney of Chambersburg, who in turn went to Sharpe and Elder, who were conducting the matter for the syndicate, and got from them the particulars of the scheme, after which he advised Mr. Allender to accept the note of Aug. Wolf & Co., provided 80 shares of the preferred stock of the reorganized company were put up as collateral, and this arrangement was agreed to; the Wolf Company being given until December 1st to carry it out, which was subsequently extended to January 1st, the reorganization not having been perfected by December 1st, as expected. In the meantime, however, the expert accountants, who were investigating the affairs of the company in the interest of the syndicate, made an unfavorable report, and when Allender came to see about his note, January 1st, he was informed that the contemplated reorganiza-

tion was not going through, at least with these parties. Walk told him that the option had been withdrawn at the request of Mr. Wolf, and that the syndicate had given 90 days in which to repay the $92,000 which had been advanced—$10,000 of which was to be taken care of February 1st, $30,000 more by March 1st, and the balance by May—which he expressed his doubt of the ability of the company to do, depending, as it did, on Mr. Wolf's getting the money from other sources. But Mr. Wolf himself explained that he had called off the deal because he had not been fairly treated in the appraisement of the property, stating at the same time that the trade debts had been taken care of by Aug. Wolf & Co. down to about $30,000, including the note of Allender, and that the Wolf Company in consequence was better off financially than it had been for years. He further promised Allender to pay his note within 10 days. Coming again to Chambersburg at the end of that time, Wolf was not on hand to meet him with the promised money. This made him angry, and he accused Wolf to Walk of intending to beat him out of it, threatening to sue the company before the day was over. Walk told him, if he did, it would precipitate matters, and neither he nor other creditors would be paid as much as if he let his claim stand, expressing the belief that, if he did, he would get what was due him. In a couple of days Mr. Wolf appeared, and stated that he had been disappointed in his expectations and had not got the money, and after a discussion, in which Mr. Ruthrauff participated, of means which were available to secure the note, the account against the lumber company was offered and accepted, and the assignment followed.

These are not all the facts. but they are the main ones, and give a fair idea of the situation; and the question is what is to be deduced therefrom. It was plain, of course, that the Wolf Company was in embarrassed circumstances. Its debts were known to be large, its operations extended, and some of them, at least, unprofitable, and new capital was needed to carry on the business  The proposed reorganization had also failed, at least with the existing syndicate, and the money advanced by them had got to be repaid shortly. But, on the other hand, it did not follow, from any or all of this, that the company was insolvent in the sense that its assets were not sufficient at a fair valuation to satisfy its obligations. If its debts were large, so was its plant and its business; its machinery being sold all over the United States, and even as far as Japan and China. In the proposed reorganization preferred stock to the amount of $400,000 was to be issued, and a like amount of common; the syndicate who were to finance the operation putting up $150,000 to take care of the outstanding bonds and getting $180,000 of each kind of stock, and W. G. Wolf on his part receiving $170,000 of each, leaving $50,000 of each in the treasury. If figures of this magnitude were at all justified, as they apparently were in the contemplation of the parties, it was hardly suggestive of insolvency. It is true that the reorganization had fallen through; but, as explained by Mr. Wolf, the option was withdrawn at his instance, because he had not been fairly treated in the appraisement, and not necessarily, therefore, because the syndicate was not satisfied to go on with it, or to go on upon another basis.

It is said, however, that along in November or December, which was about the time that the expert accountants closed their examination, Allender had said to John T. Pensinger, another salesman, that he had heard bad reports about the company, and that, if they were true, the chances were that he would lose a lot of money; and Gladhill says that Allender knew the result of the examination, as every one did about the office, and discussed it with him frequently before the time of the transfer. But, on the other hand, Gladhill admittedly told Allender in November that he believed the company was solvent, and Pensinger, although a director, says that the suggestion of Allender was an entire surprise to him; while Walk, the treasurer, says that the report of the experts, which was not made until the middle of December and was kept from the public, was the first that he knew otherwise. The fact, also, on which some stress is laid, that, as was known to Allender, the company had sent out letters to creditors requesting an extension, and asking them to accept the notes of Aug. Wolf & Co. in settlement, is met by the further fact that this was done in pursuance of the scheme of reorganization, and according to H. G. Wolf, the president, had resulted in putting them in far better shape than they had been. While, then, there may have been abundant signs of embarrassment, the same cannot be charged as to insolvency. The most that can be said is that there was enough to put Mr. Allender on inquiry. But where could he inquire, that he had not? Or what further could he hope to elicit? He had appealed to H. G. Wolf, not only as an officer of the company, but as a friend, putting him on his honor, and had been assured by him of the safety of his debt. He had again gone to Walk, the treasurer, more than once, and, while his statements were somewhat noncommittal, they certainly were not alarming. He had also consulted Mr. Ruthrauff, a local attorney, who had in turn gone to Sharpe and Elder, the attorneys engaged in the reorganization; and surely he did not need to repeat all this, or to call for new assurances. Nor can he be charged with notice that the condition of the company was other or different than had been so represented to him. The suggestion of Gladhill that Allender knew what the experts had reported, and had discussed it with him, is denied by Allender, and, aside from this, is too general and sweeping a statement to be accepted as proving actual knowledge, as is the finding of the master based upon it. He may have known that the report was unsatisfactory, as was evident, because the reorganization was not carried out as contemplated. But that is far from knowing that it showed the company to be insolvent. Nor did he manifest any more anxiety about his claim than he had before that, as would have been the case if he had such knowledge. The idea that Allender could go to the books is not to be thought of. Neither could he expect to get access to the report of the experts, if it had been asked for. It is not intimate and inaccessible information, such as this, that a creditor is bound by, but that which is open to observation and will yield to reasonable inquiry, where it has not been expressly brought home to him. No doubt, in the present instance, Allender was anxious over his debt, and pressed for its payment, and may have expressed apprehension with regard to it. But this is not to be carried too far, nor made to operate too strongly

against him, particularly in view of the assurances which he had received from those best calculated to know, on which he had the right to rely, to the contrary.

The special master has made an admirable report, from which I may well hesitate to differ, although his findings in some respects go further than seems to be warranted by the evidence, notably at the close of the seventh and tenth paragraphs, and possibly in other places. His conclusion, also, that the assignment was executed without authority, was abandoned at the argument. But he is particularly mistaken, as I am constrained to feel, in holding that, all things considered, there was reasonable cause to believe that the company was insolvent, so as to make the transfer of the security in question a preference which further inquiry, if prosecuted, would have disclosed. This, in my judgment, cannot be sustained; and, the transfer being otherwise valid, the money realized on the account which was assigned to the petitioner must be turned over to him to apply on his claim.

And it is so ordered.